# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

               Plaintiff,

v.

Michael James Constantine,
also known as John Lee Constantine,
also known as Mike James
Constantine, also known as Michael
James Constantino, also known as,
Michael James Constatine, also known
as Michael James Hogeland, also
known as Robert Stewart Hogeland,
also known as Michael James Kellum,

               Defendant.

Crim. No. 10-157 (DWF/JJK)

**REPORT AND RECOMMENDATION**

---

Allen A. Slaughter, Jr., Esq., Assistant United States Attorney, counsel for Plaintiff.

Robert D. Richman, Esq.; and Brook R. Mallak, Esq., Brook Mallak Law Office, P.A., Assistant Federal Defender, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Defendant Michael James Constantine's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 18), and Pretrial Motion to Suppress Defendant's Statement to Law Enforcement (Doc. No. 19). This Court held a hearing on the motions on July 21, 2010, and received testimony from Government witness St. Paul Police Officer Mark Nelson. This Court also received three exhibits from the

Government, including audio recordings of three phone calls purportedly involving Defendant, the audio recording of the November 18, 2008 statement provided by Defendant, and a St. Paul Police Department *Miranda* form signed by Defendant on November 18, 2008. The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Defendant's motions be denied.

## BACKGROUND[1]

On November 18, 2008, Officer Mark Nelson began investigating Defendant Constantine after working with a confidential informant whom officers had arrested that day on a firearm offense. (Tr. 5-6, 26.) The informant agreed upon his arrest to cooperate with the officers in exchange for leniency, and he reported that he knew Defendant Constantine, that Defendant was prohibited from possessing firearms based on his prior convictions, and that he might be able to buy a gun from Defendant. (Tr. 5-6, 27.) The informant did not know Defendant's home address, but he described to Officer Nelson the area in which the home was located. (Tr. 6.) Specifically, the informant stated that the home was near the Noose Bar, which is located on the northeast corner of Seventh and Duluth in the City of St. Paul. (Tr. 6-7.) The informant also told Officer Nelson

---

[1] The following summary is based on Officer Mark Nelson's testimony provided at the July 21, 2010 hearing and the hearing exhibits. Officer Nelson has worked for the St. Paul Police Department for eleven years, and has worked in the narcotics unit for approximately five and a half years. (Doc. No. 29, 7/21/10 Hearing Transcript ("Tr.") 5.)

that Defendant would ride around in a red Pontiac Grand Prix or Grand Am. (Tr. 6.)

This was the first time that Officer Nelson had worked with this particular informant, and the informant had an extensive criminal history. (Tr. 26-27.) Officer Nelson checked Defendant's record and corroborated that he did, in fact, have prior convictions. (Tr. 6.) Officer Nelson also knew Defendant Constantine by reputation within the St. Paul Police Department, and believed that Defendant had information that might possibly be useful concerning burglary activity in St. Paul. (Tr. 28.)

Officer Nelson and the informant discussed the informant's knowledge of Defendant's activities while the informant was sitting in the front seat of Officer Nelson's unmarked vehicle at the Ramsey County Law Enforcement Center. (Tr. 10.) The informant had a phone number that he said was Defendant's number and offered to call him to set up a buy.[2] (Tr. 7, 30.) And the informant consented to Officer Nelson recording the phone call. (Tr. 8.) Officer Nelson sat down with the informant, took out a digital recording device, and had the informant put a microphone in his ear. (Tr. 7.) Officer Nelson then put a headset in his own ears so that he could monitor both sides of the phone conversation that the informant would initiate. (Tr. 7.) At approximately 3:00 p.m., the informant dialed the number he thought to be Defendant's phone number.

_____

[2] Officer Nelson testified that he was "pretty sure" that they checked the number in their records-management system to verify that the phone number was Defendant's, but that he did not believe they had any corroboration. (Tr. 31.)

(Tr. 10.) A female answered the phone, and the informant asked to speak to Mike. (Tr. 30.) A male's voice then came on the call, which the informant thought to be Defendant's voice. (Tr. 30.) During the phone call, Officer Nelson heard the informant and Defendant have a discussion in which the informant asked Defendant "if Bobby grabbed one of those," and whether Bobby was there. (Tr. 12-13, 32.) Defendant responded that Bobby did [grab one of those], and that it was "pretty small." (Hr'g Ex. 1, track 2.)[3] The informant told Defendant that he would like to "trade him one and, then, a couple hundred for that." (Tr. 13.) Defendant then said, "what, for real? Cool. Don't say nothin'." (Hr'g Ex. 1, track 2.) Defendant agreed to meet the informant, but stated he had something else to do first, so it would have to wait at least a half hour. (Hr'g Ex. 1, track 2.)

After the phone call, Officer Nelson talked with the informant about what had just gone on during the call. (Tr. 13.) The informant explained when he said "one of those" he was referring to a gun, and that he was arranging to obtain a firearm from Defendant. (Tr. 14, 33.) The informant stated (and Officer Nelson heard) that in order to get that firearm, he had arranged to give Defendant a different firearm and a couple hundred dollars. (Tr. 14.) Officer Nelson asked

---

[3]     Government counsel explained at the hearing that Ex. 1 comprises three phone calls recorded separately on three tracks, but that the calls were saved on the CD out of order. The actual chronological order of the three phone calls made to Defendant, as they occurred on November 18, 2008, is as follows: first call is recorded as Track 2; second call is recorded as Track 1; and third call is recorded as Track 3.

the informant who "Bobby" was.  (Tr. 32.)  The informant told Officer Nelson that he did not know Bobby's real name.  (Tr. 32.)  Officer Nelson then discussed with the informant that the officers wanted him to get Defendant away from his home to give the officers a good opportunity to catch Defendant with the firearm. (Tr. 14.)

Shortly thereafter, the informant made a second phone call to Defendant; Officer Nelson listened to the call and recorded it with the informant's consent. (Tr. 14-15.)  During this second phone call, the informant explained to Defendant why he needed a different firearm, and what he was going to use it for.  (Tr. 15.) Specifically, the informant told Defendant that he wished to use the firearm that he was going to acquire from Defendant in "a sting," and that he wanted to "keep [the firearm that he wanted to exchange] in the family."  (Tr. 16.)  Defendant confirmed that the "one" he could trade was "real small."  (Hr'g Ex. 1, track 1.) The informant then arranged to meet Defendant at a location to get the small firearm from Defendant; Defendant wanted to conduct the transaction at "Steph's" house.  (Tr. 15-16.)

Officer Nelson testified that he understood "sting" to mean that the informant would use the firearm in a robbery or a criminal event, and that when the informant said that he wanted to "keep[] it in the family" that meant that he did not want to dispose of the firearm after the criminal event or robbery.  (Tr. 16.) Officer Nelson understood the conversation to be one where the informant was attempting to acquire a small disposable firearm from Defendant that he could

use and then dispose of afterwards.  (Tr. 16.)  The informant told Officer Nelson that Defendant had a girlfriend and/or mother of his child named Steph, who lived in the area of Sixth and Earl, and that this was where the exchange would take place.  (Tr. 16-17.)

Officer Nelson then spoke with some other officers and reviewed some St. Paul Police Department records to attempt to corroborate some of the information that the informant had provided.  (Tr. 17.)  Officer Nelson learned that there was an individual named Stephanie Colburn who lived at XXX XXXXXXX, which is a couple of blocks away from Sixth and Earl in St. Paul, Minnesota. (Tr. 17.)  Officer Nelson also learned that Defendant has a child with Ms. Colburn and he is known to frequent her address.  (Tr. 17.)  After learning these pieces of information, Officer Nelson briefed the assisting officers and arrest teams at the law-enforcement center.  (Tr. 17.)

Shortly thereafter, Officer Nelson, another officer, and the informant left the law-enforcement center in Officer Nelson's unmarked police vehicle and drove to the area of Ms. Colburn's address to set up surveillance.  (Tr. 17-18.)  They arrived near the location at approximately 3:40 p.m., and upon arrival, Officer Nelson saw a red, Pontiac Grand Am (or Grand Prix) parked directly in front of Ms. Colburn's house, facing south, and Defendant was standing by the front door

of the house.  (Tr. 18-19, 35.)[4]  Officer Nelson testified that he recognized

Defendant from the booking photographs that he had reviewed before leaving the

police station.  (Tr. 36-37.)  Officer Nelson continued driving southeast for a

couple of blocks, made a U-turn, and then stopped to set up surveillance on

Ms. Colburn's address.  (Tr. 18.)  At that time, the informant placed a third

recorded phone call to Defendant in an effort to lure Defendant away from

Ms. Colburn's address to a different location.  (Tr. 19.)  Officer Nelson recorded

this phone call with the informant's consent.  (Tr. 19.)  During the call, the

informant and Defendant had agreed to meet at a gas station in the area of

Seventh and Bush to conduct the transaction.  (Tr. 19-20.)

After the informant made the phone call, Officer Nelson observed

Defendant and Darrick Vall[5] leave Ms. Colburn's house and get into the Pontiac

parked in front.  (Tr. 19.)  Defendant got in the front passenger seat of the car,

and Mr. Vall got in the driver's seat.  (Tr. 19.)  Officer Nelson saw the Pontiac

drive away toward the southeast and then turn around, heading in the direction of

the agreed-upon meeting point.  (Tr. 19-20.)  At the time, Officer Nelson was over

a half of a city block away using binoculars.  (Tr. 52-53.)  Officer Nelson testified

that he does not recall seeing anything that might have been a gun that either

---

[4]     Officer Nelson believes that someone ran the plates on the vehicle to
determine who the vehicle was registered to, and he is fairly certain that the
vehicle did not register to Defendant.  (Tr. 35.)

[5]     Officer Nelson did not know at the time, but now knows that Darrick Vall
uses the street name of "Bobby."  (Tr. 32.)

Mr. Vall or Defendant were carrying or any bulges that might have been a gun, but that the firearm they ultimately recovered could easily fit in a front pocket. (Tr. 35.)

After the two men left in the red Pontiac, Officer Holter, the other officer accompanying Officer Nelson, advised the arrest teams to stop the vehicle, and a short time later, multiple arrest teams and multiple officers stopped the vehicle, approached it with guns drawn, forced Defendant out of the vehicle, and placed Defendant and Mr. Vall in handcuffs. (Tr. 20, 37.) Officer Nelson then arrived at the scene. (Tr. 37.) After the scene was secure, Officer Nelson approached the red Pontiac on foot and looked inside. (Tr. 20.) He saw a .22 caliber revolver sitting just under the front passenger seat. (Tr. 20.) Sergeant McCarty, the supervising officer on the scene, took custody of the gun. (Tr. 38.) Officer Nelson testified that he did not recall whether they brought the vehicle to headquarters or whether it was towed to the impound lot. (Tr. 38.) At that point, Officer Schwartz transported Defendant to the law-enforcement center. (Tr. 21.) Officer Nelson testified that had he not found the firearm in the car that day, he would have had to release both Mr. Vall and Defendant back to their vehicle. (Tr. 53.)

After Defendant arrived at the law-enforcement center, Officer Nelson brought Defendant from a holding cell to an interview room. (Tr. 22.) During the transfer, Officer Nelson introduced himself and explained to Defendant why he was under arrest. (Tr. 22.) At that time, Officer Nelson also asked Defendant if

he wanted to speak with him or if he would rather be booked into jail without speaking to him.  (Tr. 22.)  Defendant told Officer Nelson that he wanted to speak to him.  (Tr. 22.)  Officer Nelson denies that this conversation involved a discussion about the possibility of Defendant cooperating by providing him with "ounce-methamphetamine dealers"; Officer Nelson represents that they discussed this topic later.  (Tr. 39.)  Officer Nelson also testified that he did not tell Defendant that if he cooperated they would not charge him with the gun charge, nor did he tell Defendant that if he cooperated they would release him that day.  (Tr. 39.)  In addition, Officer Nelson testified that he did not tell Defendant that if he wanted to cooperate that he would have to confess to this crime first.  (Tr. 43.)

Officer Nelson then brought Defendant into an interview room where Sergeant McCarty was present, took off his handcuffs, turned on the digital recorder, and read him his *Miranda* rights, using a standardized *Miranda* form. (Tr. 21-23, 24.)  He asked Defendant certain biographical information, and then read Defendant his rights from the *Miranda* form, pausing after advising him on each of the four rights to allow him to initial next to the corresponding right if he understood it.  (Tr. 23-24.)  Defendant then read aloud a paragraph that stated, "The above rights have been read to me.  I have initialed each paragraph to show that I understand each of my rights.  I have received a copy of this form[,]" and then signed the form, acknowledging such.  (Tr. 24; Hr'g Ex. 3.)

Officer Nelson then conducted an in-custody interview with Defendant concerning the circumstances surrounding his arrest. (Tr. 21-22.) Officer Nelson recorded the interview, and, during the interview, Defendant made incriminating statements. (Tr. 24-25.) The entire recorded statement lasted approximately four minutes. (Tr. 46-47.) Neither during the transfer to the interview room, nor during this interview did Officer Nelson make any threats or promises to Defendant to get him to make his statement. (Tr. 25.)

After Officer Nelson finished the interview with Defendant concerning the circumstances surrounding his arrest, and after Officer Nelson turned off the recording device, Officer Nelson talked with Defendant about possibly cooperating and the benefits of cooperation. (Tr. 25, 40.) Sergeant McCarty was not present for this portion of the discussion. (Tr. 45.) Defendant agreed to cooperate and provided Officer Nelson with some information about some people. (Tr. 40-41.) Officer Nelson testified that the officers never record discussions regarding cooperation "because defendants are very unwilling to talk about sources of supply, who they can set up, things of that nature, on tape." (Tr. 44.) Officer Nelson claims that officers "don't get a forthcoming answer most of the time if defendants are being recorded in regard to that [because] [t]hey're afraid of it being played in court later." (Tr. 44-45.)

After this discussion, Officer Nelson gave his telephone number to Defendant and released him prior to booking. (Tr. 39-41.) Defendant was subsequently indicted for being an Armed Career Criminal in Possession of a

Firearm in violation of Title 18, United States Code, Sections 922(g)(1), 924 (a)(2), and 924(e).  (*See* Doc. No. 1.)

## DISCUSSION

As set forth in his post-hearing brief, Defendant argues that his motions to suppress evidence obtained as a result of search and seizure and to suppress Defendant's statement to law enforcement should be granted because (1) the search of the car in which Defendant was a passenger was constitutionally defective; and (2) his post-arrest statement was not knowing and voluntary.  This Court addresses both arguments in turn.

## I.    Defendant's Motion to Suppress Evidence

Defendant challenges the officers' search of the red Pontiac in which he was a passenger on the ground that they did not have probable cause to believe there would be contraband inside the vehicle.  Based on this challenge, Defendant moves to suppress the physical evidence seized from the vehicle. Specifically, Defendant contends that the information provided by the confidential informant lacked reliability because of the fact that the informant had no record of providing reliable information, and the informant had just been arrested and was only hoping for leniency.  Defendant also contends that the investigation that followed (i.e., phone calls made by the confidential informant to Defendant), was not sufficient to establish probable cause.  Defendant asserts that the phone calls are problematic because there was reference to "Bobby" and his involvement in

procuring a gun, but there was no explanation as to who Bobby was or what had happened prior to the confidential informant making the first phone call.

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. *United States v. Roby*, 122 F.3d 1120, 1123 (8th Cir. 1997). "A traffic stop constitutes a seizure within the meaning of the Fourth Amendment," *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004) (internal quotations omitted), and must, therefore, be supported by reasonable suspicion or probable cause. *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). "In determining the reasonableness of an automobile search or seizure, the Supreme Court recognizes that automobiles are inherently mobile, motorists have a lessened expectation of privacy when traveling on the public highways, and '[a]utomobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls.'" *Johnson v. Crooks*, 326 F.3d 995, 997-98 (8th Cir. 2003) (hereinafter "*Crooks*") (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)).

As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception. *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also United States v. Ross*, 456 U.S. 798, 805 (1982) (stating that the Fourth Amendment does not require that police obtain a warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity). "Probable cause exists when, given the totality of the circumstances, a

reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (*citing Illinois v. Gates*, 462 U.S. 213, 236 (1983)).[6] "[P]robable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity[.]" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005). When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002); *see also Tokar v. Bowersox*, 198 F.3d 1039, 1046-47 (8th Cir. 1999) ("The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effects of the facts in the totality of circumstances.") (quotations omitted). And this Court is required to give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997)

---

[6]     Defendant asserts that there would only be a basis to search the car if there was probable cause to believe that Defendant had "possession of a gun." If Defendant means *actual* possession of a gun, he is incorrect. There would be a basis to search the car if there was a fair probability that contraband or evidence of a crime would be found inside the car. Therefore, there would be a basis to search the car if there was a fair probability to believe that a gun would be found in the car in proximity to Defendant; the officers need not necessarily also have probable cause to believe that the Defendant was in actual possession of it at the time. The officers' reasonable belief that there was a gun in the vehicle creates a fair probability that there was evidence of the crime inside the car because the presence of the gun in the car under the passenger seat where Defendant was sitting (being in proximity to Defendant) would be circumstantial evidence that Defendant possessed it.

(citations omitted). "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *United States v. Morales*, 283 F.3d 952, 953 (8th Cir. 2001) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).

Considering the totality of the circumstances that were known to Officer Nelson just prior to the stop and search of the red Pontiac, this Court concludes that the information was sufficient to establish the necessary probable cause to support the search of the red Pontiac for a gun. The fact that the confidential informant was a first-time informant and was under arrest at the time that he provided Officer Nelson with the information that Defendant was in possession of a firearm, that Defendant was prohibited from possessing firearms, and that the informant could possibly purchase a gun from Defendant, does not mean that his information lacked reliability. *See United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000) (stating that the informant contacted officer face-to-face, which is more reliable than an anonymous phone call because "the officer has an opportunity to assess the informant's credibility and demeanor," and when information is about "someone nearby . . . the informant is exposed to a risk of retaliation from the person named, making it less likely that the informant will lie."); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be

held accountable if his information proves false.") (quotations omitted); *United States v. Delario*, 912 F.2d 766, 768 (5th Cir. 1990) (concluding there was reasonable suspicion even though the informant was a first-time informant of unproven reliability, because the informant "predicted in great detail the events which would transpire, and each was corroborated by police observation"). Here, the confidential informant reported to Officer Nelson face-to-face that Defendant possessed firearms and that he thought he might be able to purchase one from him. He provided a phone number for where Defendant could be reached, a specific location for where Defendant was likely to be found, and stated that he believed that Defendant was prohibited from possessing firearms. During this face-to-face contact, Officer Nelson had an opportunity to assess the confidential informant's credibility and determine that his statements had some reliability based on Officer Nelson's own experience dealing with reports of criminal activity from informants. In addition, Officer Nelson corroborated some of the confidential informant's information by learning that Defendant's mother of his child's name was Steph, that her address was close to where the informant had reported that it was, and that Defendant was prohibited from possessing firearms. Although this information may seem innocuous, "independent corroboration of even innocuous facts makes it more likely an informant is telling the truth about incriminating ones, and corroboration of innocent behavior can provide the basis for establishing probable cause." *United States v. Ketzeback*, 358 F.3d 987, 991-92 (8th Cir. 2004).

Further, through Officer Nelson's continued investigation and the use of the confidential informant to make phone calls to Defendant, Officer Nelson heard first-hand Defendant agree to trade a firearm. Officer Nelson observed Defendant at the location where the informant said he would be, observed the red Pontiac—previously identified by the confidential informant—parked directly in front of Steph's home, and observed Defendant take steps consistent with the plan set up by the informant (and overheard by Officer Nelson) to conduct a gun trade—all which further corroborated the information provided by the confidential informant. Based on all of this information, the officers had probable cause to believe that Defendant was on his way to the pre-arranged location with a gun to conduct the gun trade. Therefore, there was a fair probability that contraband or evidence of criminal activity was inside the red Pontiac, and the search was not unconstitutional.[7] Thus, Defendant's motion to suppress evidence obtained in the search should be denied.

## II.  Defendant's Motion to Suppress Statements

Defendant contends that any statements he made following his arrest should be suppressed because they are fruits of the unlawful seizure. Because this Court concludes that the seizure was not unlawful, Defendant's motion to suppress statements should be denied on this ground.

---

[7]   Because this Court finds that the search of the car was supported by probable cause, and because the officers did find a gun under the passenger seat where Defendant had been sitting, this Court also concludes that there was probable cause to support Defendant's arrest.

Alternatively, Defendant argues that he did not knowingly and voluntarily waive his rights prior to providing his statement. A defendant may waive the rights conveyed in *Miranda* warnings provided the waiver is voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is the Government's burden to show by a preponderance of the evidence that the suspect's waiver meets these standards. *Miranda v. Arizona*, 384 U.S. 436, 473 (1966). Whether a waiver is voluntary, knowing, and intelligent depends on the totality of the circumstances. *Moran*, 475 U.S. at 421. To make a knowing and intelligent waiver, the defendant must have "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Syslo*, 303 F.3d 860, 865 (8th Cir. 2002). Courts look to such factors as the age and education level of the defendant, lack of advice as to constitutional rights, length of detention, "repeated and prolonged nature of questioning," and the use of physical punishment. *Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988).

Further, whether or not *Miranda* is implicated, the Supreme Court has recognized that, in order for a confession (or incriminating statement), to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000) (stating that the Supreme Court applies the due process voluntariness test). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances

surrounding the giving of a confession." *Id.* at 434. A statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations omitted).

Whether a defendant's will has been overborne is determined by an examination of the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure. *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). Some factors this Court may consider in evaluating the totality of the circumstances include: the age of the accused; the level of education of the accused; the lack of advice to the accused on his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Brave Heart*, 397 F.3d at 1041 ("[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices . . . . None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation cause the defendant's will to be overborne.") (quotations and citation omitted).

The government bears the burden of proving voluntariness by a preponderance of the evidence. *Brave Heart*, 397 F.3d at 1040.

Defendant argues that he did not make a knowing and voluntary waiver because he only agreed to waive his rights in the context of a discussion of cooperation. Specifically, Defendant asserts that Officer Nelson "undermined the efficacy of the Miranda warnings" "[b]y telling him he would be released if he waived his rights and cooperated[.]" (Def.'s Mem. 6.) First, this assertion is directly contrary to the facts in the record. Officer Nelson testified several times that the subject of cooperation was not approached until after they had finished their interview with regard to Defendant's involvement in the crime he had been arrested for. Defendant's argument that "[i]t is simply not plausible that this discussion did not occur until after [Defendant's] confession[,]" (Def.'s Mem. 6), is attorney argument and is a theory not based on any record facts before this Court.

Defendant also takes issue with the fact that Officer Nelson testified that as he escorted Defendant to the interview room, he asked Defendant "if he wanted to speak with [him] or be booked into jail without speaking to [him]." (Tr. 22.) Defendant interprets this statement to mean that Officer Nelson gave Defendant the choice to either speak with Officer Nelson and not be booked into jail, or to not speak with Officer Nelson and be booked into jail. However, in the context of Officer Nelson's entire testimony, this Court does not agree with that reading. Instead, Officer Nelson was giving Defendant the option of speaking with him

prior to being booked into jail, or not speaking with him, which would mean they would proceed straight to booking. At the time Officer Nelson made the statement, the plan was to book Defendant into jail—the question was whether Defendant wanted to speak to the officers first or not.

Based on the totality of the circumstances, this Court concludes that the Government has shown that Defendant's waiver was voluntary, knowing, and intelligent. The Government produced signed form that indicates that Defendant understood all of the rights afforded him under *Miranda* and then waived those rights. The Government also produced an audio recording indicating the same. Defendant did not at any time ask for clarification, and when Officer Nelson read Defendant his rights, he allowed Defendant time to initial next to the corresponding right if he understood it. Defendant then signed the form, acknowledging that the rights had been read to him and that he understood each of his rights. There is no evidence that Defendant had a limited capacity to understand the concepts communicated to him. Defendant was not questioned for an unreasonably long period (in fact, it was quite short), and he had only been detained for a short period of time when the interview occurred. In addition, it is undisputed that Defendant is a veteran of the criminal justice system. There is also no evidence that the officers used any physical punishment or other coercive tactics to procure the waiver. Considering the totality of the circumstances, this Court finds that Defendant understood his *Miranda* rights and waived them knowingly and intelligently.

Further, based on the record presented, this Court finds no evidence to reflect that Defendant's statements were involuntary, or that there were any specific instances of coercion. The record reflects instead that the interview was the product of Defendant's own decision to cooperate with law enforcement. There is no evidence that the officers threatened, employed deceptive stratagems, strong arm tactics, or even raised their voices to get Defendant to waive his *Miranda* rights and talk. And Defendant does not assert the existence of any physical or mental impairments that would impact the voluntariness analysis. Therefore, viewing the totality of the circumstances, this Court finds that Defendant's will was not overborne and the statements that he made during the interview were voluntary. *See United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (noting that a statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired") (quotations omitted). Therefore, Defendant's motion to suppress the statements made to law enforcement should be denied.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 18), be **DENIED**; and

2. Defendant's Pretrial Motion to Suppress Defendant's Statement to Law Enforcement (Doc. No. 19), be **DENIED**.

Date: August 17, 2010

*s/Jeffrey J. Keyes*

JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 24, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief on or before **August 31, 2010**.[8] All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

---

[8] At the hearing, the parties agreed that the Court could impose a shortened objection period.